IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SAMANTHA GUZIK, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:17-CV-01065 |
| | § | |
| NANCY A. BERRYHILL, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[1] in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 14), Defendant's Cross Motion for Summary Judgment (Document No. 15), and Defendant's Response to Plaintiff's Motion for Summary Judgment (Document No. 16). After considering the cross motions for summary judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Cross Motion for Summary Judgment (Document No. 15) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 14) is DENIED, and the decision of the Commissioner is AFFIRMED.

## I. Introduction

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on August 14, 2017. (Document No. 11).

Plaintiff, Samantha Guzik ("Guzik" or "Plaintiff") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her application for disability insurance benefits and supplemental security income. Guzik argues that the Administrative Law Judge ("ALJ") failed to consider all the evidence when rendering a decision on Guzik's claim. Guzik argues that the ALJ did not fully address Guzik's mental health impairments. Further, the ALJ failed to give proper weight to available medical records from the Department of Veteran's Affairs. Guzik seeks an order reversing the ALJ's decision, and awarding benefits, or in the alternative, remanding her claim for further consideration. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Guzik was not disabled, that the decision comports with applicable law, and that the decision should, therefore, be affirmed.

## II. Administrative Proceedings

On July 15, 2014, Guzik filed for social security disability insurance benefits and supplemental security income claiming she has been disabled since December 27, 2007, due to psychophysiological insomnia, severe depression, and anxiety disorder. (74-94, 221-230). The Social Security Administration denied her applications at the initial and reconsideration stages. (74-124). On February 26, 2015, Guzik requested a hearing before an ALJ. (138-139). The Social Security Administration granted her request, and the ALJ held a hearing on June 1, 2016. (185-212, Tr. 43-73). On July 26, 2016, the ALJ issued his decision finding Guzik was not disabled. (25-37). Guzik sought review by the Appeals Council of the ALJ's adverse decision. (314). The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused her discretion; (2) the

ALJ made an error of law in reaching her conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. After considering Guzik's contentions in light of the applicable regulations and evidence, the Appeals Council, on November 23, 2016, concluded that there was no basis upon which to grant Guzik's request for review. (6-11). The ALJ's findings and decision thus became final.

After requesting an extension of time to file a civil action with the Social Security Administration, Guzik timely filed civil action no. 4:17-cv-01065, *Samantha Guzik v. Nancy A. Berryhill Acting Commissioner of the Social Security Administration* in the United States District Court for the Southern District of Texas requesting review of the ALJ's decision. (Document No. 1). Guzik has filed a Motion for Summary Judgment (Document No. 14). Likewise, the Commissioner has filed a Cross Motion for Summary Judgment (Document No. 15) and a Response to Plaintiff's Motion for Summary Judgment (Document No. 16). This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 533. (Document No. 7). There is no dispute as to the facts contained therein.

## III. Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits, is only "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "[t]he findings of the Commissioner of Social Security as

to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. *Id.* While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV.  Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving her disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act

defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. *Id.* § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

*Id.* § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if she is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

> The Commissioner applies a five-step sequential process to determine disability status:
>
> 1. If the claimant is presently working, a finding of "not disabled" must be made;
>
> 2. If the claimant does not have a "severe" impairment or combination of impairments, she will not be found disabled;
>
> 3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;
>
> 4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and
>
> 5. If the claimant's impairment prevents her from doing any other substantial gainful activity, taking into consideration her age, education, past work experience, and residual functional capacity, she will be found disabled.

*Id.*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden

of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

In the instant action, the ALJ determined, in her July 26, 2014, decision that Guzik was not disabled at step five. (25-37). In particular, the ALJ determined that Guzik had not engaged in substantial gainful activity since December 27, 2007, the alleged onset date, and that she met the insured status requirements of the Act through December 31, 2019 (step one); that Guzik's diagnoses of affective disorder, anxiety disorder, and borderline personality disorder were severe impairments (step two); that Guzik did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1 of the regulations (step three); that Guzik had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: "She can perform simple, routine, repetitive tasks, with occasional changes in a routine work setting; she can occasionally interact with co-workers and the general public." (31).

The ALJ further found that Guzik was unable to perform any past relevant work (step four); and that based on Guzik's RFC, age, education, work experience, and the testimony of a vocational expert, that Guzik could perform work as an industrial cleaner sweeper, packager, and label coder, and that Guzik was not disabled within the meaning of the Act (step five). (35-36).

As a result, the Court must determine whether substantial evidence supports the ALJ's step five finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

## V. Discussion

The objective medical evidence shows that Guzik has been treated for anxiety, depression anger, insomnia, and severe attention and concentration problems.[1] The record consists of medical records including correspondence of Bill Abright, PhD, LCSW dated July 23, 2007 and an October 31, 2007 Diagnostic Polysomnography Report.[2] The records show that Dr. Abright met with Guzik for several counseling sessions between July 23, 2007 and October 31, 2007.[3] Dr. Abright evaluated Guzik for depression, anxiety, and fatigue including excessive daytime sleepiness.[4] In a July 23, 2007 letter to his medical staff, Dr. Abright expressed concern about Guzik's high level of depression and generalized anxiety, and stated, "…Based on my clinical judgment, I would definitely give Ms. Davis[5] a provisional diagnosis of Major Depressive Disorder with anxiety symptoms that is often expressed as anger and extreme frustration." Further, the Multiple Sleep Latency Test administered on October 31, 2007, at the Georgetown Sleep Center showed a score of nineteen out of twenty-four points indicating excessive daytime

---

[1] *See* 315-316, 327, and 342.
[2] *See* 315-316.
[3] *Id.*
[4] *Id.*
[5] Guzik is formerly known as Samantha Davis.

sleepiness. Guzik was taking Zoloft, an anti-anxiety medication, and Ambien, a prescription sleep aide, at the time of the test.[6]

The record further reflects that between December 2013 and the end of May 2014, Guzik received primary care treatment at the One Health Ohio Community and Medical and Dental Center ("One Health Ohio")[7]. The treatment notes are narrative and summarize the office visits. During Guzik's initial visit on December 27, 2013, a "Patient Plan" was generated by Marian Mattern, MSN, CNP, and in addition to being treated for flu-like symptoms, Guzik was given dietary counseling, physical activity counseling, tobacco cessation counseling, and was referred to mental health counseling due to a diagnosis of mood disorder.[8] It was also noted that Guzik takes 25 milligrams ("mg") of Zoloft daily.[9]

In a visit to One Health Ohio on January 6, 2014, Guzik presented with symptoms associated with fatigue.[10] Guzik was administered a Patient Health Questionnaire (PHQ-9) and was assessed with an initial diagnosis of Major Depressive Disorder based upon the screening total.[11] The psychiatric evaluation during the same visit was summarized by Dr. Dwinnells as follows:

> Psychiatric:
> The patient is oriented to time, place, person, and situation.
> The patient has normal insight, exhibits normal judgment.
> The patient demonstrates the appropriate mood and affect.

---

[6] See 316.
[7] The record reveals that Guzik had appointments at One Health Ohio on December 27, 2013 (342-343), January 6, 2014 (344-348), March 19, 2014 (349-353), April 22, 2014 (354-359), May 20, 2014 (360-366), May 27, 2014 (367-371) and August 15, 2014 (372).
[8] See 342-343.
[9] Id.
[10] See 344.
[11] See 345.

Guzik was diagnosed with depression. M. Dwinnells increased Guzik's daily dosage of Zoloft to 50 mg, and she was referred for further mental health counseling.[12] Guzik's Zoloft prescription was increased again to 100 mg during a visit with Marrian Mattern, MSN, CNP on March 19, 2014, for insomnia.[13] During a May 20, 2014 office visit, Guzik complained of depression, diminished interest or pleasure, difficulty sleeping, and depressed mood.[14] Guzik's prescription for Zoloft was renewed at the same dosage of 100 mg per day.[15] During Guzik's final visit at One Health Ohio a week later on May 27, 2014, Guzik was diagnosed with chlamydia and administered an oral antibiotic.[16] In a letter dated August 15, 2014, One Health Ohio indicated they attempted to contact Guzik several times regarding appointments, but she never returned for any visits with this provider.[17]

During June 2014, the record reveals that Guzik began receiving mental health counseling at Coleman Behavioral Health ("Coleman").[18] The record reflects that Guzik had an initial Access Diagnostic Assessment on June 3, 2014 with Dr. Marsha Schott, and a follow-up counseling session on July 2, 2014, with Dr. Jamie Hain.[19] The session notes are narrative in nature and contain primarily subjective reports by Guzik.[20] In the initial session at Coleman, Guzik reported that she was attempting to obtain social security disability and veteran's disability.[21] Guzik reported that she served in the Army from 2006-2007 but was dishonorably

---

[12] *See* 347.
[13] *See* 349-353.
[14] *See* 360-365.
[15] *Id.*
[16] *See* 367-371.
[17] *See* 372.
[18] 320-324.
[19] *Id.*
[20] *Id.*
[21] 322.

discharged due to habitual lateness.[22]  Guzik further reported that she had difficulty sleeping most nights and went forty-eight hours without sleep in the past, interfering with her ability to get out of bed in the morning to go to work.[23]  Guzik denied suicidal intentions but admitted there were times when "I think about killing people" from anger.[24] Guzik also admitted that she was arrested during 2007 for animal cruelty and that she beat her own dog out of rage.[25]  Overall, Guzik concluded that she felt fearful because it was becoming more difficult for her to control her anger.  She also reported auditory hallucinations in which should could hear God speaking to her and that she felt her life was "insane".[26]

Providers noted that Guzik was not taking medication due to pregnancy, and had no history of substance abuse or prior psychiatric hospitalizations.[27]  Dr. Schott also noted that Guzik's seven-month-old daughter had died due to an unknown cause. [28]  The following is a summary of Guzik's DSM diagnoses as of June 3, 2014 made by the providers at Coleman and Guzik's Global Assessment Functioning score as of that date:

**Axis I:  Clinical Disorders**

| DSM Code – Description | ICD-9 Code – Short Description | Pri/Sec | Comments |
|---|---|---|---|
| 296.90 – Mood Disorder NOS | 296.99 – Episodic Mood Disorder NEC | 1 | R/O bipolar vs. major depression |
| 307.42 – Primary Insomnia | 307.42 – Persistent Insomnia | 2 | |

---

[22] *Id.;* Guzik's testimony from a June 1, 2016 hearing before the ALJ indicated that she worked nearly 24 months in 92 Alpha Logistic Supply in a warehouse while serving in the military.  (Tr. 47).  This was during the same time period where Guzik received a provisional diagnosis of Major Depressive Disorder with anxiety symptoms by Dr. Abright.  (315-316).
[23] 322.
[24] *Id.*
[25] *Id.;* Guzik was treated for a dog bite on her right arm at St. Joseph Health Center on May 24, 2014.
[26] 322-323.
[27] *Id.*
[28] *Id.*

| DSM Code – Description | ICD-9 Code – Short Description | Pri/Sec | Comments |
|---|---|---|---|
| 309.81 – Posttraumatic Stress Disorder | 309.81 – Posttraumatic Stress Disorder | 2 | |
| 312.34 – Intermittent Explosive Disorder | 312.34 – Intermittent Explosive Disorder | 2 | |

## Axis II:  Personality Disorders and Mental Retardation

| DSM Code – Description | ICD-9 Code – Short Description | Pri/Sec | Comments |
|---|---|---|---|
| 799.9 – Diagnosis Deferred on Axis II | 799.9 – Unknown Cause of Mord/Mort NEC | 2 | BPD traits |

## Axis III:  General Medical Conditions

| ICD-9 Description | Pri/Sec |
|---|---|
| Client is 3 months pregnant | 2 |

## Axis IV:  Psychosocial and Environmental Problems

| Description | Severity | Comments |
|---|---|---|
| Other psychosocial and environmental problems | Severe | No income, no supports |

## Axis V:  Global Assessment of Functioning Scale

| Current GAF Score | 39 |
|---|---|

According to the record, Guzik received no further treatment at Coleman.  Guzik was evaluated for a disability determination by unit physician Jennifer Haaga, Psy.D. on December 18, 2014.[29]  Dr. Haaga completed a mental residual functional capacity assessment of Guzik during a consultative visit.[30] Dr. Haaga's evaluation consisted of a face-to-face clinical interview

---

[29] *See* 374-383.
[30] *Id.*

with Guzik wherein they discussed: Guzik's personal history, educational history, community problems, substance abuse history, health history and medications, mental health history, work history, and Guzik's activities of daily living.[31]

Dr. Haaga summarized the results of Guzik's mental status examination as follows[32]:

## Mental Status

### *Appearance and Behavior*

"Ms. Guzik was dressed appropriately in clean appearing casual wear. Her grooming and hygiene were adequate. She was cooperative during the interview, volunteering information and details readily. She maintained good eye contact, demonstrated adequate motivation, and voiced that she understood the purpose of the evaluation. Overall, her interaction with this examiner during the current evaluation was adequate."

### *Flow of conversation*

"Speech was 100% understandable. Rate of speech was rapid, rhythm was normal, volume was normal, and amount of speech was hypertalkative. Articulation was clear. Thought processes were logical, organized, coherent, and rambling."

### *Mood and Affect*

"Ms. Guzik's mood appeared depressed with congruent affect . . . Ms. Guzik's psychomotor activity during the evaluation was restless. She will explode on people out in the world but not in jobs . . ."

### *Anxiety*

"During the current evaluation, Ms. Guzik demonstrated no motor manifestations of anxiety."

### *Mental Content*

"Ms. Guzik did not appear to be responding to internal stimuli; delusional content was not noted in her spontaneous speech . . ."

### *Bodily Concerns*

---

[31] *Id.*
[32] *See* 374-383 for all quoted conclusions from Dr. Haaga's report.

"No fears or concerns regarding specific illness other than those in the medical history were reported."

As for Guzik's level of functioning, Dr. Haaga wrote[33]:

### Sensorium and Cognitive Functioning

"Ms. Guzik was oriented to person, place, time, and situation. She correctly stated: her age, date of birth and social security number. She did not need reminders of what she was asked. She correctly identified the current day of the week, year, and President. On the digit span test, she was able to correctly recall five digits forward and four digits backwards. . . She interpreted the statement, 'don't count your chickens before they've hatched' to mean 'don't think something is going to happen before it does and don't assume.' She interpreted the statement, 'what goes around comes around' to be 'karma.' She correctly explained the similarities between 'fork' and 'spoon' and 'piano' and 'drum' on the similarities task . . . Mrs. Guzik was not able to indicate the continent where Brazil is located but indicated that Martin Luther King, Jr. was 'someone who has a dream and I knew he is famous for that but I don't know what he was.' She stated that if she were to find an envelope in the street that is sealed, addressed and had a new stamp on it, she would put it in a mailbox . . . Overall, the impression of her cognitive functioning is in the average range of ability.

Her attention and concentration was adequate, and her ability to abstract was adequate. . ."

### Insight and Judgment

"Ms. Guzik appears to have fair common sense reasoning and judgment. She has fair insight into her current situation. She appears cognitively and psychologically capable of living independently and making decisions about her future. She appears to seek appropriate services in the community. She demonstrated adequate motivation during the evaluation."

### Psychological Testing

"No psychological testing was requested or conducted."

Dr. Haaga's DSM-5 Diagnoses and final prognosis were[34]:

### <u>DSM-5 Diagnosis</u>

Persistent Depressive Disorder, early onset, with anxious distress, with intermittent major depressive episodes, moderate, 300.4

---

[33] *See* 379.
[34] *See* 380.

Other Specified Trauma and Stressor Related Disorder, adjustment-like disorders with prolonged duration of more than six months without prolonged duration of stressor, 309.89
Unspecified Personality Disorder, 301.89
Cannabis Use Disorder, in early remission, current severity mild, 305.20
Claimant reports: pregnancy, insomnia
Not employed, financial difficulties

## Prognosis[35]

"It is likely that should she engage in treatment, she may experience some improvements in her symptoms."

For Dr. Haaga's overall Functional Assessment she opined[36]:

## Functional Assessment

*Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions.*

"[Guzik] described some difficulties with memory and demonstrated no significant difficulties with memory during the current evaluation. She is capable of comprehending and completing simple routine tasks as well as more complex tasks . . ."

*Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks.*

"[Guzik] recalled five digits forward and four digits backward on the digit span task. However, her symptoms of anger and anxiety will likely cause difficulties in this area, or will exacerbate those difficulties that she does have. This will make many tasks somewhat more difficult. Specifically, when the demands become too great, Ms. Guzik will have some difficulty with her attention and concentration . . ."

*Describe the claimant's abilities and limitations in responding appropriately to supervision and to co-workers in a work setting:*

"Ms. Guzik's interaction with this examiner during the current evaluation was adequate, and she described that she maintained good relationships with family.

---

[35] Dr. Haaga expressed that Guzik's reported symptoms were largely consistent with her presentation during the clinical interview on December 18, 2014.
[36] *See* 381-382.

She has a history of some interpersonal problems with supervisors and coworkers
. . ."

*Describe the claimant's abilities and limitations to responding appropriately to work pressures in a work setting.*

"Ms. Guzik does not take psychiatric prescription medication to help manage symptoms but continues to experience difficulties. She has positive relationships with family. These relationships may create a positive social support system which may positively influence her ability to withstand stress and pressures of work activities . . ."

Overall, Dr. Haaga opined that anger and anxiety will occasionally interfere with Guzik's functionality, but that she has an adequate support system in place through family to help influence how she may cope with these issues in a work setting. Further, Dr. Haaga opined that Guzik is capable of comprehending and completing both simple and routine tasks despite limitations that may arise should the demands or stresses of a job become too great.[37] If Guzik engaged in treatment, Dr. Haaga predicted that her psychiatric symptoms would likely subside. Ultimately, Guzik's claim for social security disability was denied.[38]

The record further reflects that commencing January 2015, Guzik began receiving extensive primary and mental health care through the Department of Veteran's Affairs ("VA").[39] Guzik received primary care treatment, psychotherapy and medications for treatment of mental issues from various doctors between February 2015 and the beginning of May 2016 at VA clinics.[40] The available notes are narrative in nature.

---

[37] *See* 381-382.
[38] *See* 6-11; 22-42.
[39] Guzik served in the Army twenty-three months from 2006-2007 and is eligible for veteran's benefits.
[40] Guzik began receiving treatment from the Cleveland VAMC on February 20, 2015 where a Behavioral Health Interdisciplinary Treatment Plan was established through Julie J. Ainslie, Clinical Social Worker, Linda McNair, Clinical Social Worker, Sharon Phillips, Clinical Nurse Specialist, Dr. Barbara M. Rodriguez, Physician, and Dr. Gerard W. Cerimele, Psychologist. (440). Guzik subsequently had visits on February 24, 2015 (438), March 13, 2015 (435), April 3, 2015 (431), April 10, 2015 (428), April 15, 2015 (422), April 20, 2015 (414, 420), April 21,

In an initial visit to the Cleveland VA Medical Center ("Cleveland VAMC") on February 20, 2015, Guzik was assigned a Mental Health Coordinator, and an outpatient Mental Health Treatment Plan was established to treat depression, anger, and irritability.[41] The goal of the treatment plan was to "reduce depressive symptoms of anger, irritability, loss of interest and motivation, and low energy."[42] Guzik received a risk assessment as a victim of abuse.[43] In an interpretative summary, it was noted that Guzik was on time for her appointment, brought her six-week-old infant along, and that she interacted with him in a "loving and appropriate way."[44] Further, Guzik was perceived to be polite, cooperative, and alert by treating medical personnel.[45]

Guzik returned to the Cleveland VAMC for a scheduled individual supportive therapy session with Julie Ainslie ("Ainslie") on February 24, 2015.[46] It was noted that Guzik planned to move to Texas to re-unite with her ex-husband, and that she sent him $3,000 so he could find them a place to live, but did not hear from her ex-husband after sending him the money.[47] Guzik indicated that she has an issue with knowing who to trust and that if she were to get back with her ex, she would get over her depression because she would be more motivated to shower and

---

2015 (409), April 28, 2015 (401), May 12, 2015 (397), May 26, 2015 (394), June 9, 2015 (392), June 19, 2015 (387), and Guzik's final visit at the Cleveland VAMC was on June 30, 2015 (385). Guzik relocated to Florida and resumed treatment at the Leesburg VA Clinic, Lake Baldwin Mental Health Clinic, and Orlando VA commencing November 10, 2015 (485-486). Guzik had visits on November 17, 2015 (486), November 18, 2015 (486), November 19, 2015 (486), November 20, 2015 (486), December 4, 2015 (486), December 7, 2015 (486), December 10, 2015 (486), December 11, 2015 (486), December 15, 2015 (486), December 17, 2015 (486), December 18, 2015 (486), January 6, 2016 (485), and January 26, 2016 (485).

[41] See 440-443.

[42] See 443.

[43] See 441. Guzik self-reported being sexually harassed during her service in the Army by another female recruit, and that she observed her father abuse her mother as a child.

[44] See 442.

[45] Id.

[46] See 438.

[47] Id.

cook for someone other than herself.[48]  Ainslie supported Guzik's insights while providing empathy and active listening.[49]  Ainslie also brought it to Guzik's attention that she was capable of being assertive and even aggressive (as self-reported by Guzik) in other situations, and that Guzik could improve upon these situations with continued therapy.[50]

On April 3, 2015, Guzik had an individual psychotherapy session with Ainslie.[51]  Guzik brought along her six-year-old son.[52]  Guzik was casually dressed and displayed adequate hygiene and grooming.[53]  Guzik's attitude was polite and cooperative but her mood was depressed, anxious, and angry.[54]  During the session, Guzik's thought process was coherent and logical with no flight of ideas or loose associations, and she posed a low risk of harm to herself or others.[55]  Guzik reported that she felt worse and was still having difficulties motivating herself to clean or shower.[56]  Guzik also expressed that she was yelling at her children often and out of concern that she might harm her infant child, so she left the infant with a trusted friend for the week.[57]  Ainslie, however, noted that Guzik interacted warmly and appropriately with her son during the session.[58]  Ainslie further discussed that Guzik was likely experiencing depression and that Guzik should contact Children's Services to ask for help related to her children.  Ainslie also advised Guzik that if the conditions of her mental health status and messy home did not improve,

---

[48] *See* 439.
[49] *Id.*
[50] *Id.*
[51] *See* 431.
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.*

Ainslie would be required to call Children's Services.[59] Guzik was calm towards the end of the session and agreed to schedule another therapy session for the following week.[60]

Guzik appeared for her next individual psychotherapy session with Ainslie on April 10, 2015.[61] Guzik presented with her six-year-old and her three-year-old children.[62] Again, Guzik was appropriately dressed and groomed, and appeared polite and cooperative.[63] Guzik explained to Ainslie that she cleaned up part of her home, and that her infant son had returned to her care.[64] Ainslie noted that she interacted appropriately with her present children during the session.[65] Ainslie also provided active listening and validation, and informed Guzik that she had achieved some positive things since her last session.[66] Guzik agreed to return for another therapy session in two weeks and was calm at the end of the session.[67]

Guzik had a primary care visit with Sharon Phillips ("Phillips"), a nurse specialist, on April 15, 2015.[68] Guzik was dressed casually and appropriately, and her attitude was pleasant yet somewhat tense.[69] Guzik smiled and initiated appropriate conversation with Phillips.[70] Guzik presented with symptoms suggestive of bi-polar disorder, including: moderate anxiety, mood swings, hypersexual behavior, excessive spending, extremes in moods, anger, depression, irritability, excessive talking, and racing thoughts.[71] Phillips noted that the mood extremes may be related to the birth of Guzik's infant during January 2015, and Guzik was prescribed

---

[59] *Id.*
[60] *Id.;* Guzik did not actually show up for her scheduled appointment on April 8, 2015 (430).
[61] *See* 428.
[62] *Id.*
[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] *See* 429.
[67] *Id.*
[68] *See* 422.
[69] *Id.*
[70] *Id.*
[71] *See* 424.

Divalproex, a mood stabilizer.[72] Phillips instructed Guzik to monitor her response to the new pharmacology regimen, and to return in one month for a follow-up appointment.[73]

On April 20, 2015, Guzik saw psychologist Dr. Emily Breighner for completion of a V.A. Disability Benefits Questionnaire ("DBQ") for a Psychiatric Mental Disorder Compensation and Pension examination.[74] Guzik was on time for her scheduled exam and brought her infant son and three-year old son with her.[75] Guzik's self-presentation was dramatic with loud, rapid speech.[76] Her insight and judgement were fair at present, and she presented with emotional lability and immaturity.[77] Further, Guzik endorsed thoughts of suicide without plan, and indicated her children were protective factors preventing her from taking suicidal action.[78]

In addition to reviewing all of Guzik's available Veteran's Affairs medical records and her military separation documents,[79] Dr. Breighner administered the Beck Depression Inventory—Second Edition.[80] Guzik scored a forty-one (41) out of sixty-three (63), and score above twenty-nine (29) indicates severe depression.[81] Guzik was diagnosed with Unspecified Bipolar Related Disorder, PTSD related to death of daughter during 2010, and Borderline Personality Disorder were listed on the DBQ.[82] Based on the test results, Dr. Breighner further indicated that Guzik would experience occupational and social impairment with deficiencies in

---

[72] *Id.*
[73] *Id.*
[74] *See* 414-421.
[75] *See* 420.
[76] *Id.*
[77] *Id.*
[78] *Id.*
[79] *See* 416.
[80] *See* 412-413.
[81] *Id.*
[82] *See* 414.

most areas, including work, school, family relations, judgment, thinking and/or mood.[83]   In

explaining Guzik's occupational and social impairments, Breighner wrote:

> "Ms. Guzik's occupational and social impairment is driven by symptoms such as difficulty with mood, motivation, energy, concentration, and interpersonal relationships. These problems related to the diagnosis of Unspecified Bi-polar Related Disorder, PTSD, and Borderline Personality Disorder. In particular, mood instability and concentration difficulties are a common factor between the three diagnoses.
>
> Bipolar-Related Disorder includes periods of hypersomnia and insomnia, rapid pressure speech, flight of ideas/racing thoughts, distractibility, and hypersexual behavior.
>
> PTSD entails trauma re-experiencing, avoidance of cues, hypervigilance, and emotional changes.
>
> Borderline Personality Disorder refers to a pattern of unstable and intense interpersonal relationships, identity disturbance, impulsivity, suicidal behaviors, affective instability, intense anger, and stress-related paranoid thoughts."[84]

Dr. Breighner further opined that Guzik lacked family and social support since her closest

family members lived in Florida,[85] and that she had difficulty forming and maintaining

relationships with others.[86]   Further, after reviewing her military and occupational history,

Breighner further found that Guzik had a history of chronic interpersonal conflicts and difficulty

coping with stress in occupational settings, which included being fired from multiple jobs and

discharged from the army after serving less than two years.[87]

---

[83] *See* 415.

[84] *See* 414-415.

[85] Guzik was residing in Ohio at the time the DBQ was completed for the VA.

[86] *See* 417.

[87] Guzik was discharged from the military after refusing to be taken off psychiatric medication to meet deployment requirements. Guzik also expressed during her clinical interview with Breighner that she did not like taking psychotropic medications because she did not like putting pills in her body, explaining periodic noncompliance with pharmacological treatment.

Dr. Breighner's overall conclusion was that Ms. Guzik had a **significant** psychiatric disability.[88] Based on evidence obtained during the clinical interview, psychological testing, and medical records, the level of severity for Guzik's service related disability was established at seventy (70) percent by Dr. Breighner.

The following day, April 21, 2015, Guzik returned to the Cleveland VAMC for a post-partum appointment scheduled four months after the birth of her infant son.[89] Guzik noted little residual pain in her back from the epidural, and stated she was not sexually active at the time.[90] Guzik was prescribed oral contraceptives but expressed she was poorly compliant, and requested to be put back on the Nuva Ring to prevent pregnancy.[91] The postpartum check was overall unremarkable and Guzik expressed no issues related to her mood whatsoever.[92]

On April 28, 2015, Guzik saw Ainslie for another individual psychotherapy session.[93] Guzik's hair appeared styled and she was wearing makeup and clothing which were remarkably nicer than previous visits.[94] Guzik's mood was anxious and excited, but not depressed. [95] Guzik stated to Ainslie that she made a new female friend through church and would be traveling to California on a trip with her. This friend was also living with Guzik to assist her with caring for her home and children.[96] Ainslie provided Guzik with active listening, and they explored Guzik's past concerning trusting and making friends too quickly.[97]

---

[88] *See* 419.
[89] *See* 405-406.
[90] *Id.*
[91] *Id.*
[92] *Id.*
[93] *See* 401.
[94] *Id.*
[95] *Id.*
[96] *See* 401-402.
[97] *Id.*

Two days later, on April 30, 2018, a nurse called Guzik to follow-up regarding her responses to the dosage of Divalproex prescribed to Guzik.[98] Guzik stated she was feeling okay at that time, and did not voice any suicidal or homicidal ideations.[99] Guzik was pleasant and she spoke in a coherent, normal tone.[100] Further, Guzik agreed to schedule an appointment for June 2015 to have her blood drawn related to the medication.[101]

Guzik appeared for three psychotherapy sessions with Ainslie on May 12, 2015, May 26, 2015, and June 9, 2015.[102] Guzik again was accompanied by some of her children during two out of the three visits, and her mood ranged from depressed and anxious to possibly hypomanic.[103] Guzik showed adequate hygiene and grooming during all three visits.[104] The common discussion amongst all three sessions related to Guzik's continual eagerness to trust strangers too quickly.[105]

Ainslie provided active listening with empathy during the sessions but outlined for Guzik all of the times she had been taken advantage of since she began therapy with Ainslie including: providing money to her ex-husband followed by his disappearance, allowing a female stranger (who was also allegedly a minor) to move into her home, Guzik's trip to California which resulted in a physical altercation with that same female, and Guzik speaking to a strange man online and her plans to meet the man in person in Michigan.[106] Overall, Ainslie expressed

---

[98] *See* 400.
[99] *Id.*
[100] *Id.*
[101] *Id.*
[102] See 392-398.
[103] *Id.*
[104] *Id.*
[105] *Id.*
[106] *Id.*

caution, worry, and indicated to Guzik how to identify when she was being too trusting, and how to handle these situations by being direct and using communication.[107]

Guzik had her final appointments on June 19, 2015 and June 30, 2015 at the Cleveland VAMC prior to relocating to Florida to be closer to family.[108] During a medication reconciliation on June 19, 2015, Guzik stated she was feeling "good," but that she only took her prescribed bipolar medication for two weeks because it gave her stomach aches.[109] Guzik complained of anxiety and requested that she be prescribed Hydroxyzine for anxiety because it helped her in the past.[110] Phillips noted that Guzik's mood was stable, she was less aggressive towards her children, and she reported feeling calmer.[111] Guzik admitted to using cannabis but was nonspecific regarding the amount of same.

During her final therapy session at Cleveland VAMC with Ainslie on June 30, 2015, Guzik reported that her mood was better than it had been for quite a while, and that she was awarded 100% veteran's disability.[112] Ainslie observed that Guzik was feeling more secure and grateful since being awarded at 100%, and she felt less need to attach herself to others.[113] Ainslie believed Guzik was finally thinking more long term and was able to plan ahead rather than focus on one day at a time.[114] Guzik expressed gratitude for being awarded veteran's disability and agreed to continue working towards treatment goals.[115]

The record shows that several months lapsed while Guzik moved to Florida and prior to her receiving any further medical treatment. On August 12, 2015, Guzik met with Robert

---

[107] Id.
[108] See 387-391.
[109] See 387.
[110] Id.
[111] See 389.
[112] See 385.
[113] See 386.
[114] Id.
[115] Id.

Campbell, a social worker at the Leesburg VA clinic. Guzik requested assistance related to housing.[116] Guzik expressed that she desired to live with her grandmother, however, was unable to do so because her grandmother lived in a fifty-five (55) and older restricted community.[117] Campbell provided Guzik with contact information for a realtor in Leesburg who was known to assist veterans looking for housing.[118] In a follow-up call during October 1, 2015, Guzik informed Campbell that she was able to secure housing for her and her three children.[119]

On September 28, 2015, Guzik returned to the Leesburg VA Clinic to have an initial primary care consultation.[120] Guzik was evaluated for chronic management of pain, and reported pain on her back and tingling after having several epidurals.[121] Further, Guzik expressed that she has constant abdominal pain accompanied by slow digestion.[122] Guzik's mental history was noted, however, but the only present complaint related to her prior mental diagnoses was that she experienced increased stress related to moving into a new home in Florida.[123] Generally, Guzik appeared "well nourished, well developed, and in no acute distress."[124]

The record further shows that Guzik had a Mental Health Initial Evaluation with Rosemarie Cropper, D.O., staff psychiatrist at the Leesburg VA Clinic, on November 10, 2015.[125] Dr. Cropper reviewed Guzik's mental treatment history and diagnoses during a clinical

---

[116] See 496-497.
[117] Id.
[118] See 497.
[119] Id.
[120] Id.
[121] Id.
[122] Id.
[123] See 498.
[124] See 499.
[125] See 488-494.

interview, in addition to reviewing Guzik's history in the military.[126] The available notes are narrative.

During her mental status exam, the records show Guzik was depressed, angry, irritable, an anxious.[127] The following are a portion of Dr. Cropper's observations during the exam:

Intelligence Level:  average
Fund of knowledge:  fair
Attention:  normal
Concentration:  brief
Memory:  Recent:  intact
            Remote:  intact
Thought processes:  tangential, nightmares
Hallucinations:  none
Judgment:  fair
Insight:  fair
Impulse control:  fair

The following are Dr. Cropper's diagnoses[128]:

Borderline personality disorder, anxiety, insomnia, depression, cannabis and tobacco use disorders, r/o bipolar disorder.

The following is the treatment plan[129] compiled by Dr. Cropper:

Psychiatric meds:  trazodone 50 mg nightly, bupropion sa 150 mg daily x 14 days then bid and continue hydroxyzine 25 mg daily as needed.

Therapeutic technique/approach involved a veteran centered approach which includes rapport building, exploration of triggers for anger & depressive symptoms, empathic listening, & recovery planning/management.

Guzik agreed to this plan and medication regimen suggested by Dr. Cropper.[130] In a subsequent Suicide Risk Assessment on November 16, 2015, performed by Dr. Cropper, Guzik

---

[126] *Id.*
[127] *See* 491.
[128] *See* 492.
[129] *Id.*
[130] Subsequently, Guzik reported on December 4, 2015 to a social worker that she was pregnant with her fifth child and desired to be alerted as to which medications she should cease taking. Dr. Cropped advised Guzik that she should stop taking the trazodone, a sleeping pill, and could

was found to be a low risk for suicide.[131] On December 4, 2015, Guzik had a Social Work Psychological Assessment performed by Campbell.[132] Guzik provided reports of her presenting symptoms, military history, medical history, and mental health history.[133] These reports were largely consistent with reports made to other prior treating physicians, however, Guzik revealed that she struggled with promiscuity dating back to her teens.[134]

In a follow-up visit on January 26, 2016, with Dr. Cropper, it was noted that Guzik was confirmed to be pregnant and ceased taking all medications.[135] Guzik indicated that she was feeling better since she found roommates to help her pay rent and assist her with childcare.[136] Guzik described herself as emotional, but within the normal limits of what is expected during pregnancy.[137] She denied being depressed or anxious.[138] Guzik also admitted continuing to use marijuana at times during pregnancy, but ceased smoking cigarettes.[139]

The final available medical record dated May 20, 2016, is a Medical Source Statement of Ability to Do Work Related-Activity sent from Dr. Cropper to Chris Bell, a non-attorney disability consultant representing Guzik at the time the request was made.[140] Dr. Cropper's medical findings where that, "[Guzik] has a long history of impulsive behaviors. She has difficulty getting her children to school consistently because of periods of depression. Currently

---

continue taking the bupropion if it helped her depression, since limited data showed no increased risk to fetus. (495).

[131] See 510.
[132] See 525-526.
[133] See 525-530.
[134] See 528.
[135] See 506.
[136] Id.
[137] Id.
[138] Id.
[139] Id.
[140] See 532-533.

unable to be on medications since she's pregnant."[141]  Dr. Cropper further indicated that Guzik

could satisfactorily perform the following work-related activities[142]:

> Interacting appropriately with the public; asking simple questions and requesting
> assistance; getting along with co-workers and peers; maintaining socially
> appropriate behavior; adhering to basic standards of cleanliness; be aware of
> normal hazards and take precautions; travel in unfamiliar places or use public
> transportation; and set realistic goals or make plans independently of others.

Dr. Cropper also indicated that Guzik could perform the following work-related activities

satisfactorily some of the time[143]:

> Accepting instructions and appropriate criticism from supervisors; and responding
> appropriately to changes in the work setting.

Here, substantial evidence supports the ALJ's finding that Guzik's diagnoses of affective

disorder (mood disorder), anxiety disorder, and borderline personality disorder were severe

impairments at step two, and that such impairments at step three, individually or in combination,

did not meet or equal a listed impairment. The ALJ addressed listings 12.02, 12.03, 12.04, and

12.06 and concluded that Guzik did not meet or equal the listings.  With respect to these listings,

the ALJ considered medical records and hearing testimony.  Substantial evidence supports this

determination.

As for listings 12.02, 12.03, 12.04 and 12.06, the ALJ wrote:

> The severity of the claimant's mental impairments, considered singly and in
> combination, do not meet or medically equal the criteria of listings 12.02, 12.03,
> 12.04, and 12.06.  In making this finding, the undersigned has considered whether
> the "paragraph B" criteria are satisfied.  To satisfy the "paragraph B" criteria, the
> mental impairments must result in at least two of the following:  marked
> restrictions of activities of daily living; marked difficulties in maintaining social
> functioning; marked difficulties in maintaining concentration, persistence, or
> pace; or repeated episodes of decompensation, each of extended duration.  A
> marked limitation means more than moderate but less than extreme.  Repeated
> episodes of decompensation, each of extended duration, means three episodes

---

[141] *Id.*
[142] *Id.*
[143] *Id.*

within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living, the claimant has moderate restriction. Although the claimant alleges that her mental impairments interfere with all aspects of her daily activities, as she is constantly confined to her house and bed due to anxiety and depression, the claimant still remains capable of taking care of her three children, ages 7, 4, and 1, as well as taking care of herself with only sporadic help from her mother, which is inconsistent with the degree of impairment alleged.

Moreover, while the claimant alleges that she has difficulties with personal care activities, such as showering and brushing her teeth (Exhibit 6F/58), the records shows that the health care professionals repeatedly find that the claimant is adequately groomed, is appropriately dressed, and displays proper hygiene, as well as going the extra step of wearing makeup and having her "hair done," (Exhibits 5F/5, 6F/2, 9, 11, 14, 18, 37, 45, 55, and 7F/11), all of which are activities inconsistent with claimant's allegations regarding her almost absolute confinement to her bed.

In social functioning, the claimant has moderate difficulties. Even though the claimant alleges that her mental impairments interfere with her ability to get along with others, causing aggressive outburst and panic attacks, as well as being impatient while interacting with others, the claimant's medical record is unremarkable as to any difficulties getting along with doctors, nurses, psychologists, or any other health care professionals, and progress notes repeatedly show that the claimant is cooperative, polite, pleasant, and calm during examinations, (Exhibits 5F/1, 6F/2, 3, 4, 6, 9, 10, 11, 12, 14, 15, 17, 18, 19, 40, 45, 46, 48, 49, 55, 56, 59, and 7F/27, and 49), which is inconsistent with the claimant's allegations regarding her inability to properly interact with others.

Further, although the claimant alleges inability to interact with others, during her psychological consultative examination, the claimant admitted that she "maintained good relationships with family," as well as with her sibling. (Exhibit 5F/3). During the hearing, the claimant also admitted that she takes care of her three minor children alone, and she reported no major problems dealing with them. During the same hearing, the claimant further admitted that her mother visits her at least once a month, and again, she reported no major difficulties getting along with her. The record also shows that the claimant has had boyfriends during the period at issue, (Exhibit 7F/45, 46), and she testified that she is currently pregnant, which indicate that the claimant has social contacts with others outside her immediate family.

The undersigned notes that, during the hearing, claimant was able to interact properly with all present, displaying a pleasant and courteous demeanor throughout the proceedings.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant alleges that her mental impairment interferes (sic) with her memory, (Exhibit 5F/4), concentration and focus, (Exhibit 6F/39), but the mental status examinations of record are not consistent with those allegations, as they regularly show results within normal limits. Particularly, the record shows that the claimant is appropriately dressed, displaying adequate hygiene and grooming, showing no abnormal movements, her attitude is polite and cooperative, her speech is normal, and, even though her mood is sometimes anxious, her mood is also congruent and appropriate to conversation, her thought content is normal, her thought process is coherent, logical, and not circumstantial or tangential, she has no flight of ideas, loose associations, or ideas of reference, she is oriented in all spheres, her insight and judgment are intact, and she displays no signs of hallucination or delusions. (Exhibits 6F/2, 9, 11, 14, 18, 45, 48, 55).

Other progress notes throughout the record also show results mostly within normal limits, since even though doctors note some anxiety, depression, defensive behavior, pressured speech, irritability and anger, they also observe normal dress, normal grooming, normal orientation, circumstantial language, normal receptive language, average intelligence, fair fund of knowledge, normal attention span, normal concentration, normal memory, no hallucinations, and fair judgment, insight, and impulse control. (Exhibit 7F/11, 2, 27, 32, 38, 42, and 49).

During the psychological consultative examination of the record, the mental status examination was unremarkable, as the psychologist observed normal dress, normal hygiene, good eye contact, normal interaction during examination, and normal speech. (Exhibit 5F/7). The same psychologist also noted that the claimant's thought processes were logical, organized, and coherent, and, although her mood appeared depressed, the claimant described her appetite as normal, her speech was spontaneous, she denied hallucinations, she was fully oriented in all spheres, her attention and concentration were adequate, her ability to abstract was adequate, and, although she alleged some difficulties with recent memory, the psychologist observed that the claimant did not demonstrate any "significant difficulties during the valuation." (Exhibit 5F/7). The psychologist further noted that the claimant displayed fair common sense and judgment, and that the claimant appeared cognitively and psychologically capable of living independently and of making decisions about her future, demonstrating adequate motivation during the interview. (Exhibit 5F/7).

Further, during the hearing, the claimant was able to answer all questions posed, asking for clarifications when required, and promptly recalling all relevant names, dates, and events.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration. The record does not document any such episodes, as they are defined by Regulation.

The State agency psychological consultants opined that the claimant has moderate restriction in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in concentration, persistence or pace. (Exhibits 2A and 5A).

The undersigned gives great weight to the opinions issued by the State agency psychological consultants, since they are consistent with the normal range of daily activities and social interactions as described above, as well as the normal mental status examination of record. Moreover, the State agency psychological consultants have specialized knowledge of the Social Security Administration's programs, and their opinions are consistent with the medical evidence as a whole.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The claimant's mental impairment(s) does not satisfy the paragraph "C" criteria of the applicable mental disorder listing(s). As to listing 12.02, as shown above, the claimant does not have marked limitations in any of the three broad areas listed on 20 CFR, Part 404, Subpart P, Appendix 1, which is required to meet a listing under sections A and B. As to section C under the 12.02 listing, there is nothing showing a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate or a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. Therefore, the undersigned finds the requirements of Paragraph C in section 12.02 are not satisfied.

As to listings 12.03, 12.04, there is nothing showing a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate or a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. Therefore, the undersigned finds the requirements of Paragraph C in sections 12.03 and 12.04 are not satisfied.

As to listing 12.06C, as described above, the medical evidence of record indicated that the claimant is able to function independently outside the area of her (*sic*) home. Therefore, the undersigned finds the requirements of Paragraph C in section 12.06 are not satisfied.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorder listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis. (28-31).

Substantial evidence supports the ALJ's determination that Guzik did not meet or equal listings for 12.02, 12.03, 12.04, or 12.06.

RFC is what an individual can still do despite her limitations. It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *2 (SSA July 2, 1996). The responsibility for determining a claimant's RFC is with the ALJ. *see Villa v. Sullivan*, 895 F.2d 1019, 1023-24 (5th Cir. 1990). The ALJ is not required to incorporate limitations in the RFC that she did not find to be supported by the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991). Here, the ALJ carefully considered all of the medical evidence in formulating an RFC that addressed Guzik's mental impairments. The ALJ's RFC determination is consistent with Dr. Haaga's and Dr. Cropper's opinions and the record as a whole. The ALJ, based on the totality of the evidence, concluded that Guzik could perform a full range of work at all exertional levels but with the following nonexertional limitations: She can perform simple, routine, repetitive tasks, with occasional changes in a routine work setting; and she can occasionally interact with coworkers and the general public. The ALJ gave specific reasons in support of this determination. The objective medical evidence weighs in favor of the ALJ's decision.

**B. Diagnosis and Expert Opinion**

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. The law is clear that "a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." *Newton*, 209 F.3d at 455. The ALJ may give little or no weight to a treating source's opinion, however, if good cause is shown. *Id.* at 455-56. The Fifth Circuit in *Newton* described good cause as where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or in otherwise unsupported by the evidence. *Id.* at 456. "[A]bsent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453.

The six factors that must be considered by the ALJ before giving less than controlling weight to the opinion of a treating source are: (1) the length of treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) the support of the source's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the source. 20 C.F.R. § 404.1527(d)(2); *Newton*, 209 F.3d at 456. An ALJ does not have to consider the six factors "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," and were the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at

458; *Alejandro v. Barnhart*, 291 F.Supp.2d 497, 507-11 (S.D.Tex. 2003). Further, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176. "The ALJ's decision must stand or fall with the reasons set forth in the ALL's decision, as adopted by the Appeals Council." *Id.* at 455; *see also Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so."). However, perfection in administrative proceedings is not required. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). Additionally, in weighing evidence, a VA determination does not bind the Commissioner; it is merely evidence for the ALJ's consideration. *See Garcia v. Berryhill*, 880 F.3d 700, 705 (5th Cir. 2018). The weight assigned to a disability determination will vary depending upon the particular circumstances of the case. *Id.*

According to Guzik, the ALJ erred in failing to consider all of the psychiatric treating records from Dr. Haaga, Dr. Cropper, providers at One Health Ohio, Cleveland VAMC, and the Leesburg VA Clinic. Guzik argues the ALJ ignored certain "findings" of Dr. Haaga, which primarily consist of subjective reports from Guzik including but not limited to: the loss of Guzik's daughter during infancy, a history of reported victimization during basic training and witnessing domestic violence in her childhood home, a lack of socialization skills and affiliations with organizations, a history of struggling academically in school and disciplinary problems.

Guzik further argues that the ALJ erred in failing to give weight to the Department of Veteran Affairs' findings of disability for Guzik at 70% for Guzik's military service related disabilities and ignored the conditions she received from VA providers. Guzik argues the ALJ failed to consider all the evidence. The Commissioner responds that ALJ properly weighed the medical opinions and performed an analysis of the opinion evidence. According to the

Commissioner, the ALJ can consider the evidence in the record without directly addressing such evidence in the decision, and that it is appropriate for an ALJ not to afford weight to an unsupported portion of a doctor's medical opinion.

With respect to the opinions and diagnoses of treating physicians and medical sources, the ALJ wrote:

> In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 96-4p. The undersigned has also considered the opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

> In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms.

> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

> The claimant alleges that her impairments interfere with or preclude her from performing activities of daily living, such as personal care, and house chores. Furthermore, the claimant alleges that her mental impairments affect her memory, ability to complete tasks, concentration, ability to follow instructions, and ability to get along with others. Finally, the claimant alleges that those limitations make her unable to engage in substantial gainful activity.

> The claimant's representative provided a detailed brief summarizing the theory of disability, (Exhibit 14E), and the undersigned considered the arguments therein under the light of the evidence of the record.

As to specific impairments, although the claimant carries diagnoses of affective disorder, anxiety disorder, and borderline personality disorder, and although claimant alleges that her mental impairment interferes with her memory, (Exhibit 5F/4), concentration and focus, (Exhibit 6F/39), the mental status examinations of record are not consistent with those allegations, as they regularly show results within normal limits. Particularly, the record shows that the claimant is appropriately dressed, displays adequate hygiene and grooming, show no abnormal movements, her attitude is polite and cooperative, her speech is normal, and, even though her mood is sometimes anxious, her thought content is normal, her thought process is coherent, logical, and not circumstantial or tangential, she has no flight of ideas, loose associations, or ideas of reference, she is oriented in all spheres, her insight and judgment are intact, and she displayed no signs of hallucinations or delusions. (Exhibits 6F/2, 9, 11, 14, 18, 45, 48, 55).

Other progress notes throughout the record also show results mostly within normal limits, since, even though the doctors have noted some anxiety, depression, defensive behavior, pressured speech, irritability and anger, they have also observed claimant's normal dress, normal grooming, normal orientation, circumstantial language, normal receptive language, average intelligence, fair fund of knowledge, normal attention span, normal concentration, normal memory, no hallucinations, fair judgment, insight, and impulse control. (Exhibit 7F/11, 2, 27, 32, 38, 42, and 49).

During the psychological consultative examination of the record, the mental status examination was unremarkable, as the psychologist observed the claimant's normal dress, normal hygiene, good eye contact, normal interaction during the examination, and normal speech. The psychologist also observed that claimant's thought processes were logical, organized, and coherent, and, although her mood appeared depressed, the claimant described her appetite as normal, her speech was spontaneous, she denied hallucinations, she was fully oriented in all spheres, her attention and concentration were adequate, her ability to abstract was adequate, and, although she alleged some difficulties with recent memory, the psychologist observed that the claimant did not demonstrated any "significant difficulties during the valuation." (Exhibit 5F/7). The psychologist also noted that the claimant displayed fair common sense and judgment, and that the claimant appeared cognitively and psychologically capable of living independently, of making decisions about her future, and demonstrated adequate motivation during the interview. (Exhibit 5F/7).

Further, during the hearing, the claimant was able to answer all questions posed, asking for clarifications when required, and promptly recalling all relevant names, dates, and events.

The undersigned notes that the degree, intensity, and frequency of the claimant's symptoms are inconsistent with the claimant's mostly unremarkable level of daily activities. For instance, although the claimant alleges that her mental impairments

interfere with all aspects of her daily activities, as she is constantly confined to her house and bed due to anxiety and depression, the claimant remains capable of taking care of her three children, ages 7, 4, and 1, as well as taking care of herself with only sporadic help from her mother, which is inconsistent with the degree of impairment alleged.

Moreover, while the claimant alleges that she has difficulties with personal care activities, such as showering and brushing her teeth, (Exhibit 6F/58), the record shows that the health care professionals repeatedly find that the claimant is adequately groomed, is appropriately dressed, and displays proper hygiene, as well as taking the extra step of wearing makeup and having her "hair done," (Exhibits 5F/5, 6F/2, 9, 11, 14, 18, 37, 45, 48, 55, and 7F/11), all of which are activities inconsistent with the claimant's allegations regarding her almost absolute confinement to her bed.

In the same manner, the undersigned notes that the degree, intensity, and frequency of the claimant's symptoms are inconsistent with the claimant's mostly unremarkable level of social interactions. Particularly, even though the claimant alleges that her mental impressions interfere with her ability to get along with others, causing aggressive outburst and panic attacks, as well as being impatient while interacting with others, the claimant's medical record is unremarkable as to any difficulties getting along with doctors, nurses, psychologists, or any other health care professionals, and progress notes repeatedly show that the claimant is cooperative, polite, pleasant, and calm during examinations, (Exhibits 5F/1, 6F/2, 3, 4, 6, 9, 10, 11, 12, 14, 15, 17, 18, 19, 40, 45, 46, 48, 49, 55, 56, 59, and 7F/27, and 49), which is inconsistent with the claimant's allegations regarding her inability to properly interact with others.

Further, although the claimant alleges inability to interact with others, during her consultative examination of record, the claimant admitted that she "maintained good relationships with family," as well as with her sibling. (Exhibit 5F/3). During the hearing, the claimant also admitted that she takes care of three minor children alone, and she reported no major problems dealing with children. During the same hearing, the claimant further admitted that her mother visits her at least once a month, and, again, she reported no major difficulties getting along with her. The record also shows that claimant has had boyfriends during the period at issue, (Exhibit 7F/45, 46), and she testified that she is currently pregnant, which indicate that claimant has social contacts with other(s) (*sic*) outside her immediate family.

The undersigned notes that, during the hearing, the claimant was able to interact properly with all present, displaying a pleasant and courteous demeanor throughout the proceedings.

The State agency psychological consultants opined that the claimant can perform simple to moderately complex instructions (1-3 steps), that she can focus

sufficiently to carry out familiar, routine tasks where there is occasional flexibility of schedule permitted to maintain focus and manage symptoms, she can have superficial and minimal social interaction with others, and she can complete tasks in a relatively static setting, where there are no abrupt or frequent changes that could exacerbate mood and anxiety symptoms (Exhibit 2A/6-7, 5A/10-11).

The undersigned gives great weight to the opinions issued by the State agency psychological consultants, since they are consistent with the normal range of daily activities and social interactions described above, as well as the normal mental status examination of record. Moreover, the State agency psychological consultants have specialized knowledge of the Social Security Administration's programs, and their opinions are consistent with the medical evidence as a whole.

Jennifer Haaga, Psy.D., who saw the claimant during a psychological consultative examination, opined that the claimant is capable of comprehending and completing simple routine tasks as well as more complex tasks, but she may have difficulties with co-workers and supervisors. (Exhibit 5F). The undersigned gives great weight to Dr. Haaga's opinion, since she examined the claimant, and was able to observe the claimant's subjective complaints, and she based her opinion upon the objective and subjective findings obtained during that detailed examination. Moreover, Dr. Haaga's opinion is consistent with the mental status examination of record. The undersigned notes that Dr. Haaga's opinion is consistent with the residual functional capacity statement listed above, which limits the claimant both socially and in terms of concentration, persistence, and pace.

The Department of Veterans Affairs (VA) has found the claimant has 70% rate of disability, according to their disability standards. (Exhibits 8D and 9D). The undersigned has considered the fact that the claimant receives VA compensation. The DVA (or "VA") makes a determination of the claimant's disability based on the evidence submitted by the claimant, the claimant's medical records, and compensation and pension (C&P) medical exam reports. The VA rates disability from 0 percent to 100 percent in 10 percent increments, but the DVA's Compensation and Rating System (CRS) is so disparate form the Social Security Administration disability adjudication system that the undersigned gives only little weight to those opinions.

Rosemarie Cropper, D.O., a physician with the Orlando's VA hospital, who has treated the claimant during the period at issue, opined that, as to her ability to understand, remember, and carry out instructions, the claimant had good to fair ability in 10 out of 12 areas under this rubric, and poor ability in the 2 remaining areas. As to the claimant's ability to respond appropriately to supervision, co-workers, and work pressures, the claimant had good to fair ability in 10 out of 10 areas under this rubric. (Exhibit 8F). The undersigned gives little weight to Dr. Cropper's overall opinion, since it is not consistent with the claimant's progress notes. As shown above, the claimant's mental status examinations have mostly

been within normal limits, and she has been able to work, and take care of three young children on her own. The undersigned notes that Dr. Cropper suggest that the claimant has only good to fair social limitations, the undersigned found a greater degree of social limitations, but, even then, the claimant remains capable of performing work related activities.

Emily Breighner, Veteran's Administration psychologist, opined that the claimant's symptoms "limits her ability to attend work regularly dur to impairment in mood/motivation," "limits her ability to relate to supervisors and peers in appropriate ways," "limits her ability to perform job tasks adequately due to poor concentration, memory, and racing thoughts," and, finally, that the claimant "is not currently able to succeed in physical or sedentary employment settings on the basis of service-connected disability." (Exhibit 6F/38). While the finding of "disabled" is reserved to the Commissioner, the undersigned considered that opinion, but gave it little weight, since it is inconsistent with the overall evidence of record, which shows mostly normal mental status findings. Moreover, that opinion is inconsistent with the claimant's normal range of daily activities and social interactions. Furthermore, the opinion appears to be based, at least in part, upon the claimant's physical complaints and limitations which are outside Dr. Breighner's area of expertise.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. (31-35).

Here, the thoroughness of the ALJ's decision shows that she carefully considered the medical records and testimony, and that her determination reflects those findings accurately. The ALJ summarized the evidence and set forth specific reasons concerning the weight given to the opinions of the medical sources. The ALJ explained her rationale for discounting Guzik's mental limitations in Dr. Cropper's, Dr. Breighner's and the VA's respective reports. As for Guzik's arguments concerning several psychological reports, the law is clear that good cause exists for an ALJ to provide little weight to a treating physician's questionnaire opinion due to its brevity and conclusory nature, lack of explanatory notes or supporting objective tests and examinations. *See Foster v. Astrue*, 410 Fed. Appx. 831, 833 (5th Cir. 2011) ([T]he

'questionnaire' format typifies 'brief or conclusory' testimony . . . [W]e agree with the magistrate judge's conclusion that 'due to its brevity and conclusory nature, lack of explanatory notes, or supporting objective tests and examinations, [the] treating physician's] opinion is given little weight.'"); *Nguyen v. Colvin*, No. 4:13-CV-2957, 2015 WL 222328, at *9 (S.D.Tex. Jan 14, 2015). The ALJ's decision also highlights Dr. Haaga's report and how it was compiled based upon objective and subjective evidence, and was consistent with the ALJ's residual functional capacity statement. Conflicts of evidence are for the Commissioner, not the courts, to resolve. *Byrd v. Comm'r of Soc. Sec.*, 368 Fed. Appx. 542, 543 (5th Cir. 2010). The ALJ gave detailed reasons in assigning weight to the medical source opinions including observations at the hearing, the progress notes detailing Guzik's treatment, and consultative examination reports. Given the proper discounting of the opinions of the VA, Dr. Cropper, and Dr. Breighner concerning Guzik's mental limitations, and the medical opinions which do support the ALJ's residual functional capacity determination, upon this record, the Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

### C. Subjective Evidence of Mental Disorder

The next element to be weighed is the subjective evidence of pain or mental impairment, including the claimant's testimony and corroboration by family and friends. The proper standard for evaluating mental impairment is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423. The statute provides that allegations of mental impairment do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause disability. Statements made by the individual or his physician as to the severity of the plaintiff's impairment must be reasonably consistent with the objective medical evidence on the record. 42

U.S.C. § 423. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant. *Hames,* 707 F.2d at 166.

Here, Guzik testified about her health and its impact on her daily activities. She offered no testimony or corroboration from her family or friends with respect to her complaints about her condition. Guzik testified that she was twenty-seven years old and had previously been married. (Tr. 46-47). She lives at home with occasional guests, is unemployed, and cares for her three children, ages seven (7), four (4), and one (1).[144] The record further reflects that Guzik was pregnant with an additional child at the time of the hearing.[145] Guzik testified that she stayed at home most of the time, but was able to drive her son to school in the mornings and occasionally took her children to the park.[146] Otherwise, her younger children remained at home with Guzik sleeping in bed with her, playing on a tablet, or watching movies.[147] Guzik remarked that she was able to feed her son when he requested to have something to eat.[148] Overall, she is able to care for her children alone with periodic visits from her mother.[149]

With respect to her educational background and occupational history, Guzik completed the 11th grade and obtained a GED.[150] Guzik served in the Army for less than two years working in a supply warehouse.[151] Guzik was discharged from the Army and subsequently employed by DIRECTTV in sales, AT&T in technical support, and Arby's as a cashier. She has also

---

[144] *Id.*

[145] *See* Tr. 64; Guzik is not in a relationship with the father of her latest child and referred to them as "cuddle buddies" prior to Guzik becoming pregnant in the record.

[146] *See* Tr. 64-67.

[147] *See* Tr. 67.

[148] *Id.*

[149] *See* Tr. 47.

[150] *See* Tr. 47-48.

[151] *Id.*

delivered newspapers, drove a taxi, and held seasonal jobs.[152]   Guzik testified that she had many

different jobs because she cannot keep one steady job for several reasons.[153]   Guzik claims that

she has a hard time reading, comprehending, and remaining focused at work.[154]   One of the

biggest reasons Guzik cannot hold down a job is that she claims to suffer from issues with severe

anger and dealing with management.[155] Guzik testified that she becomes so anxious and angry

while working that she needs to retreat to the bathroom to cry and vent frequently.[156]   This would

result in discipline from management for taking too many breaks.[157]   Guzik claims to have

difficulties getting along with others, supervisors, and adjusting to change in work settings.[158]

Guzik also testified that she suffers from bad anxiety, and this contributes to aggressive

behaviors.   Guzik explained during the hearing before the ALJ that her diagnosis of intermittent

explosive disorder makes it very difficult for her to control her anger eruptions.[159]   She testified

that she will exhibit aggressive behaviors towards her children, and once yelled at her son so

loudly he wet himself.[160]   Guzik testified that she occasionally contemplates harming herself and

others when she experiences angry outbursts.[161]   Guzik described to this state of mind as "kill

mode." Guzik further testified that she has vivid dreams about hurting others.[162]   Additionally,

Guzik claimed to experience panic attacks at least seven times a month, lasting anywhere

between thirty-minutes to an hour.[163]

---

[152] *See* Tr. 48-54; 63.
[153] *See* Tr. 52.
[154] *See* Tr. 48-49.
[155] *See* Tr. 52.
[156] *Id.*
[157] *See* Tr. 50.
[158] *Id.*
[159] *See* Tr. 57.
[160] *Id.*
[161] *See* Tr. 58.
[162] *Id.*
[163] *See* Tr. 59.

Guzik stated that she cannot work due to depression, which she compared to a weight sitting on top of her.[164] Guzik claims that she periodically suffers from deep depression, and when this occurs she is unable to get out of bed for work.[165] Guzik testified that she would be physically confined to her bed for weeks because of the depression.[166] Guzik also testified that she goes through depression every month, and would miss at least a week of work.[167]

Guzik testified that she is depressed, she does not take care of her children or her personal hygiene. Guzik cannot get out of bed to shower, clean, or care for her children because of depression.[168] Guzik testified that if her children want to eat while she is depressed, the kids will have to bring her peanut butter, jelly, and bread, and she will make them sandwiches in bed.[169] Guzik state that once she was in such a deep depression that her children had to go live with their father because she was unable to care for them or clean her home.[170]On top of depression, Guzik stated that she suffers from insomnia and will sleep for hours during the day, which also prevents her from properly caring for her kids and getting her son to school timely.[171]

Guzik further testified that she was also diagnosed with PTSD related to the death of her infant daughter during 2010.[172] Guzik discovered her daughter dead in her crib.[173] This had such a traumatic impact, Guzik frequently checks on her children while they are sleeping to ensure they are still alive.[174] Guzik testified there are times when she will believe her children

---

[164] *See* Tr. 55.
[165] *See* Tr. 50.
[166] *See* Tr. 55.
[167] *See* Tr. 51, 56.
[168] *See* Tr. 56.
[169] *Id.*
[170] *See* Tr. 60. Guzik also testifies at one point there were thirty-gallon garbage bags of trash everywhere related to her inability to clean.
[171] *See* Tr. 59.
[172] *See* Tr. 61.
[173] *Id.*
[174] *Id.*

are dead.[175]  Guzik testified that when pregnant is unable to take any medications to treat her symptoms of anxiety, anger, PTSD, or depression.[176]  Guzik testified she was awarded disability at 100% from the VA because her mental impairments are believed to be related to her service in the Army.[177]

The undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that she weighed the testimony improperly.  Accordingly, this factor also supports the ALJ's decision.

### D.  Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history and present age.  A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that she is not only unable to do her previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

The record shows that the ALJ questioned Suzanna Roche, a vocational expert ("VE"), at the hearing.  "A vocational expert is called to testify because of his familiarity with job requirements and working conditions.  'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence.  *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by

---

[175] *Id.*

[176] *See* Tr. 64.

[177] *See* Tr. 62.

the whole record. Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling*, 36 F.3d at 436.

The ALJ posed comprehensive hypothetical questions to the VE (Tr. 69-71), and Guzik's counsel questioned the VE. (Tr. 71-72). A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that Guzik was not disabled. Based on the testimony of the vocational expert and the medical records, substantial evidence supports the ALJ's finding that Guzik could perform work as a newspaper deliverer, industrial sweeper, cleaner, a hand packager, and a label coder. The Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Guzik was not disabled within the meaning of the Act and therefore was not entitled to benefits. Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented. Accordingly, this factor also weighs in favor of the ALJ's decision.

## V. Conclusion

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Guzik was not disabled within the meaning of the Act, that substantial evidence supports the ALL's decision, and that the Commissioner's decision should be affirmed. As such, it is

ORDERED Plaintiff's Motion for Summary Judgment (Document No. 14), is DENIED,

Defendant's Cross Motion for Summary Judgment (Document No. 15) is GRANTED, and the

decision of the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this _____ day of _____, 2018

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE